**LAW OFFICES OF MARTIN A. CERVANTES**
Martin A. Cervantes, Esq., Bar No. 87487
1706 Plum Lane, Suite 101
Redlands, California 92374

Telephone Number: (909) 307-9590

Attorney for: Plaintiffs MICHAEL FRYDRYCH and SUSAN FRYDRYCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

MICHAEL FRYDRYCH and SUSAN FRYDRYCH,

Plaintiffs,

vs.

CABAZON BAND OF MISSION INDIANS; CABAZON RESERVATION COURT; PAUL SLAMA (#3193); WILLIAM BANNING (#9148); TIMOTHY LOPEZ (#8826); WILLIAM BLACKSTONE (#9016),

Defendants.

CASE NO:

COMPLAINT FOR DECLARATORY RELIEF
[28 U.S.C. Sections 2201(a) and 2202; *FRCP* 57]

Plaintiffs MICHAEL FRYDRYCH ("MICHAEL") and SUSAN FRYDRYCH ("SUSAN") (hereinafter collectively referred to as "Plaintiffs") allege:

**SUMMARY OF RELIEF SOUGHT**

This Complaint seeks post-exhaustion review by this Court of the Tribal Court's determination that the doctrine of sovereign immunity precludes Plaintiffs' complaint in the Tribal Court. This requires this Court to interpret the language of

the Tribe's Tort Ordinance, which was enacted pursuant to Defendant CABAZON BAND OF MISSION INDIAN's Tribal-State Gaming Compact with the State of California. The Compact utilizes specific definitions of certain terms such as "Patron", "Gaming Facility", and "Gaming Operation". These terms are likewise incorporated into the Tribe's Tort Ordinance. Thus, this Court must interpret the Tribe's Tort Ordinance in conjunction with the Compact.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. section 1331. The exhaustion doctrine created in *National Farmers Union Ins. Co. v. Crow Tribe of Indians* (1985) 471 U.S. 845, 847, makes the issue of tribal court jurisdiction over nonmember litigants a federal question. A tribal court's determination of its jurisdiction may be challenged in federal district court. *Iowa Mutual Insurance Co. v. LaPlante* (1987) 480 U.S. 9, 19. The District Court reviews *de novo* the scope of a tribe's ability to adjudicate matters affecting non-Indians. *United States ex rel. Morongo Band of Mission Indians v. Rose,* 34 F.3d 901, 905 (9th Cir. 1994); *FMC v. Shoshone-Bannock Tribes,* 905 F.2d 1311, 1313-14 (9th Cir. 1990). In addition, general principles of federal contract law govern the Tribal-State Gaming Compacts, which are entered pursuant to Indian Gaming Regulatory Act of 1988 ("IGRA"). *Cachil Dehe Band of Wintrun Indians of the Coulusa Indican Community v. California* (9th Cir. 2010) 618 F.3d 1066, 1073. This Court also has supplemental jurisdiction over the subject matter of this action under 28 U.S.C. section 1367(a).

2. This Court has jurisdiction to adjudicate claims under 28 U.S.C. sections 2201(a) and 2202. This is an action that seeks declaratory judgment and further relief.

3. Venue is proper in the Central District of California, Eastern Division, pursuant to 28 U.S.C. sections 1391(e)(2) and 1402(b), because the acts complained of occurred in this District.

**REQUIRED PARTIES**

4. Plaintiffs are, and at all times mentioned in this complaint were, residents of Riverside County, California.

5. Defendant CABAZON BAND OF MISSION INDIANS ("CABAZON") is, and at all times mentioned in this complaint was, a federally recognized tribe of Cahuilla Indians, with its headquarters located in Indio, California. Defendant CABAZON owns and operates the Fantasy Springs Resort Casino (the "Casino").

6. Defendant CABAZON RESERVATION COURT (the "Tribal Court") is Defendant CABAZON'S Tribal Court.

7. Defendant PAUL SLAMA ("SLAMA") is, and at all times mentioned in this complaint was, the Director of Tribal Affairs for Defendant CABAZON.

8. Defendant WILLIAM BANNING ("BANNING") is, and at all times mentioned in this complaint was, the Director of Public Safety for Defendant CABAZON at the Casino.

9. Defendants TIMOTHY LOPEZ (#8826) ("LOPEZ"); WILLIAM BLACKSTONE (#9016) ("BLACKSTONE"); are, and at all times mentioned in this complaint were, employed as Public Safety Officers by Defendant CABAZON, and were acting within the course and scope of their employment at all times mentioned herein. These Defendants will be collectively referred to herein as Defendants SAFETY OFFICERS.

10. Plaintiffs are informed and believe and on that basis alleges that all of the wrongful acts of Defendants SAFETY OFFICERS referred to in this complaint were authorized and committed under instructions and express or implied approval of Defendants SLAMA and BANNING, who were, at the time the acts alleged in

the complaint were committed, directors and managing agents of Defendant CABAZON at the Casino. In addition, Plaintiffs are informed and believe and on that basis alleges that all of the wrongful acts of Defendants SAFETY OFFICERS referred to in this complaint were subsequently ratified by Defendant CABAZON in that Defendant CABAZON continued to employ Defendants SAFETY OFFICERS and Defendants SLAMA and BANNING, after the acts alleged in this complaint were committed.

11. Each of the Defendants named herein are necessary parties to the Declaratory Relief action, because this Court's determination of whether the Tribal Court properly determined the issue of sovereign immunity affects each of the named Defendants' interests, i.e., their sovereign immunity, in the underlying Tribal Court action. Accordingly, each of the Defendants are "required parties" as set forth *Federal Rules of Civil Procedure* section 19(a)(1). Failure to join each of the Defendants would subject the Complaint to a potential dismissal.

**FACTS**

12. Plaintiffs, who are husband and wife, have been regular patrons of the Fantasy Springs Resort for over ten (10) years. Plaintiffs regularly gamble in the Casino, and they also enjoy dining in the Resort's restaurants, and seeing concerts in the Special Events Center ("SEC").

13. On January 31, 2014, Plaintiffs were the invited guests of Defendant CABAZON's Gaming Division. Plaintiffs were given a complimentary dinner at the "Joy" restaurant at which time one of Defendant CABAZON's Gaming Executives joined them for dessert. After dinner, complimentary tickets to the Martina McBride concert were given to Plaintiffs by one of Defendant CABAZON's Gaming Executives on the Casino floor as a gift for being a high limit player at the Casino.

14. After dinner, at approximately 8:00 p.m., Plaintiffs entered the SEC to attend the Martina McBride concert with the complimentary tickets given to them by one of Defendant CABAZON's Gaming Executives. After Plaintiffs took their seats in a row, which was approximately eight rows from the front of the stage, they noticed their friend Robert Hughes, about six rows in front of them. Plaintiff MICHAEL went and talked with Mr. Hughes, who told Plaintiff MICHAEL that he had extra tickets, which belonged to him for a row nearer to the front of the stage. Mr. Hughes invited Plaintiffs to sit in these seats, and they accepted.

15. After Plaintiffs sat down in their new seats, they began talking about old times with Mr. Hughes. Defendant LOPEZ immediately approached Plaintiffs, and asked Plaintiff MICHAEL if the seats were his. Plaintiff MICHAEL and Mr. Hughes explained to Defendant LOPEZ that Mr. Hughes had valid tickets to the seats, and that Mr. Hughes had given them to Plaintiffs. Defendant LOPEZ told Plaintiffs and Mr. Hughes that the Casino had a policy that prohibited patrons from switching seats even though Mr. Hughes held valid tickets for the seats. Mr. Hughes became upset, and asked to speak to Defendant LOPEZ's supervisor.

16. When Defendant LOPEZ returned, Plaintiff MICHAEL showed Defendant LOPEZ the two tickets to the seats, and Defendant LOPEZ told Mr. Hughes and Plaintiffs again that switching seats was not permitted even with valid tickets. Plaintiff MICHAEL then calmly explained that he had been in the entertainment industry for over thirty (30) years and he had never heard of such a policy. Defendant LOPEZ then said "get back to your seats" at which time Plaintiff MICHAEL (while seated) asked Defendant LOPEZ in a non-confrontational manner and voice "may I ask you a question, are you an idiot?" As Plaintiff MICHAEL got up out of his seat to return to the other seats, Defendant LOPEZ got in his face, and said, "did you really call me an idiot? Because no one calls me an idiot and gets away with it." Then about five or six of Defendants

SAFETY OFFICERS swarmed Plaintiff MICHAEL, grabbed him, forced his hands behind his back, and placed "zip ties" on his wrists. Plaintiff MICHAEL began to feel pain in his back and arms as Defendants SAFETY OFFICERS roughly and forcibly started to shove him forward. As Defendants SAFETY OFFICERS were moving him out of the SEC, Plaintiff MICHAEL saw Defendant SLAMA, and said "please help me". Plaintiff MICHAEL asked this twice, and after the second time he was "slammed" into the concrete floor. Plaintiff MICHAEL's glasses flew off of his face and he felt blood running down his face. Defendants SAFETY OFFICERS then picked Plaintiff MICHAEL up off of the floor and dragged him out of the SEC along the "walkways" through the Casino floor to the security office, which serves the entire facility at the Fantasy Springs Resort. Plaintiff MICHAEL complained about the zip tie hurting his left wrist. Plaintiff SUSAN and Mr. Hughes witnessed all of the Defendants SAFETY OFFICERS' actions with regard to Plaintiff MICHAEL.

17. Once they were inside the security office, Defendants SAFETY OFFICERS forced Plaintiff MICHAEL against a wall. Plaintiff MICHAEL asked what was going on, and one of Defendant SAFTEY OFFICERS told him to keep his head on the wall. At that time, Plaintiff MICHAEL saw blood all over the wall. Plaintiff MICHAEL told Defendants SAFETY OFFICERS that he was not feeling well, and asked them to loosen the zip ties. One of Defendants SAFETY OFFICERS told him to shut his mouth, and put his head against the wall. One of Defendants SAFETY OFFICERS then forced Plaintiff's MICHAEL's head, in his own blood, against the wall, and told him the zip ties were fine. During this time, Defendants SAFETY OFFICERS would yell at him, and every time he would try to move his head to check his hand in the zip tie, they would force him back. Then one of SAFETY OFFICER asked Plaintiff MICHAEL what he had in his pockets, and Plaintiff MICHAEL responded that he had a 'cell phone in his left pocket and

cash in the right." The SAFETY OFFICER said "repeat it again" and Plaintiff MICHAEL did so. Then the SAFETY OFFICER said "if there is anything in your pockets other than what you said you're going to be sorry." Then they took the money and the cell phone, and took the zip ties off, and handcuffed Plaintiff MICHAEL. Plaintiff MICHAEL complained about the handcuff on the left being too tight and one the SAFETY OFFICERS denied it.

18. Eventually, an Emergency Medical Technician ("EMT") came into the security office and treated Plaintiff MICHAEL's head to try to stop the bleeding, which failed to do so. Later Plaintiff MICHAEL's wrist was checked. During this time, Defendant BANNING came into security office, and asked Plaintiff MICHAEL if he knew why he was there. Plaintiff MICHAEL told Defendant BANNING that he did not, and Defendant BANNING snickered at him. Plaintiff MICHAEL asked that Plaintiff SUSAN be allowed into the security office because Plaintiff MICHAEL was not feeling good, but Defendant BANNING would not allow it. Defendant BANNING then told Plaintiff MICHAEL that he was under arrest, and that the Sheriff's Department was on their way. In fact, later Plaintiff MICHAEL learned the Sheriff was never called. Plaintiff MICHAEL asked why he was under arrest, and Defendant BANNING grinned and said "You know what you did." Plaintiff MICHAEL responded "no I don't". Defendant BANNING then told Plaintiff MICHAEL he was being arrested for assaulting one of Defendants SAFETY OFFICERS. However, later Defendant BANNING told Plaintiff MICHAEL that it was his "lucky day." Plaintiff MICHAEL was released and no charges were filed against him. Plaintiffs then met outside of the security office, and Plaintiff MICHAEL took time to try to stop the bleeding and deal with the pain to his head, wrist and body. Both Plaintiffs needed this time to compose themselves emotionally before trying to leave the premises.

19. During the entire time, Plaintiff MICHAEL was in the security office, Plaintiff SUSAN and Mr. Hughes repeatedly asked to be allowed into the security room, but they were denied access.

## TRIBAL COURT PROCEEDINGS

20. On July 29, 2014, Plaintiffs timely filed written Tort Claims with Defendant CABAZON against Defendants CABAZON and its Public Safety Officers. (True and correct copies of Plaintiffs' Tort Claims are attached hereto as Exhibit "1" and incorporated by reference herein).

21. On September 3, 2015, Defendant CABAZON rejected Plaintiffs' Tort Claims. (A true and correct copy of the rejection is attached hereto as Exhibit "2" and incorporated by reference herein).

22. In an effort to exhaust the Tribal Court Remedies, Plaintiffs' Complaint was commenced against Defendant CABAZON and its Public Safety Officers in the Tribal Court within six months of Defendant CABAZON's denial of Plaintiffs' Tort Claims.

23. The Complaint filed by Plaintiffs on November 19, 2015 against Defendant CABAZON and its Public Safety Officers alleges causes of action for: (1) false arrest and imprisonment; (2) violation of California Constitution, Article 1, Section 13; (3) battery; (4) assault; (5) negligent infliction of emotional distress; (6) intentional infliction of emotional distress; (7) negligent hiring, supervision, and/or retention of employees; and (8) intentional interference with prospective civil action by spoliation of evidence (the "Complaint").

24. On April 27, 2016, the Tribal Court dismissed the Complaint on the grounds of sovereign immunity. (A true and correct copy of the Tribal Court's Ruling is attached hereto as Exhibit "3" and incorporated by reference herein).

25. In an effort completely exhaust Defendant CABAZON's Tribal Court Remedies, Plaintiffs timely filed a Notice of Appeal with the Tribal Court on

May 11, 2016. To date, Plaintiffs have not been notified by the Tribal Court as to the status of their appeal. Plaintiffs have now been informed that Defendant CABAZON does not have a Tribal Court of Appeal. Therefore, requiring Plaintiffs to exhaust their Tribal Court's remedies would be futile, and "would serve no purpose other than delay." *Nevada v. Hicks* (2001) 533 U.S. 353, 369. (A true and correct copy of the Notice of Appeal is attached hereto as Exhibit "4", and incorporated by reference herein).

**THE TRIBAL-STATE GAMING COMPACT AND CABAZON'S TORT REMEDY PROCEDURES FOR GAMING PATRONS**

26. On September 10, 1999, the Tribe and the State of California entered into a Tribal-State Gaming Compact ("Compact"). The Compact was entered into pursuant to the Indian Gaming Regulatory Act of 1988 ("IGRA"). Pursuant to Modification No. 6 to Section 10.2(d) of the Compact the Tribe must "[c]arry no less than five million dollars ($5,000,000) in public liability insurance for **patron claims**, and the Tribe shall request its insurer to promptly and fairly settle all valid claims. . . ." [Emphasis added]. It further requires that the Tribe "adopt and make available to **patrons** a tort liability ordinance setting forth the terms and conditions, if any, under which the Tribe waives immunity to suit for money damages resulting from the intentional or negligent injuries to person or property **at the Gaming Facility or in connection with the Tribe's Gaming Operation** …" [Emphasis added].

27. In compliance with Section 10.2(d) of the Compact, the Tribe adopted its Tort Ordinance (Title 5, Chapter 6 of the Cabazon Tribal Code), entitled "Tort Remedy Procedures for Gaming Patrons" (the "Tort Ordinance"). The purpose of these procedures is to provide "a system for the fair disposition of tort claims arising from alleged injuries to person or property of **patrons of the Cabazon Band's Gaming Facility** . . ." (Tort Ordinance, Section 1) [Emphasis added]. The

tort remedy procedures apply to "tort claims alleged by **patrons of any Gaming Facility** owned by the Cabazon Band of Mission Indians." (Tort Ordinance, Section 2) [Emphasis added]. The Cabazon Reservation Court has "exclusive jurisdiction over all such **patron** tort claims and other judicial matters arising from the administration and enforcement of these procedures." (Tort Ordinance, Section 6(A)) [Emphasis added]. Section 8(a) of the Tort Ordinance clearly and specifically states that "[t]he sovereign immunity of the Band is hereby waived for the sole and limited purpose of allowing **only patrons of the Gaming Facility to bring tort claims against the Band** in accordance with these procedures . . ." [Emphasis added].

27. In accordance with the terms of the Section 10.2(d) of the Compact, as modified, and Section 8(a) of the Tort Ordinance, Defendants, and each of them, have expressly and unequivocally waived their sovereign immunity, because Plaintiffs were Patrons of the Gaming Facility as those terms are defined in the Compact and the Tort Ordinance at the time of the incidents alleged in the Tribal Court Complaint and herein.

28. Defendant CABAZON's Motion to Dismiss was based on the argument that Plaintiffs were not "Patrons" of the "Gaming Facility", as those terms are defined in the Compact and the Tort Ordinance, at the time of the incidents alleged in the Tribal Court Complaint, and therefore Plaintiffs are not entitled to any remedy under Defendant CABAZON's limited waiver of sovereign immunity pursuant to its Tort Ordinance.

29. The Pertinent Definitions of the Compact:

- Section 2.8. of the Compact provides as follows:

  " **'Gaming Facility'** or 'Facility' **means any building in which Class III gaming activities or gaming operations occur,** or in which the business records, receipts, or other funds of the gaming operation are maintained . . .

***., and all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation.***" [Emphasis added].

- Section 2.9 of the Compact provides as follows:
  "***'Gaming Operation' means the business enterprise*** **that offers and operates Class III Gaming Activities** ***whether exclusively or otherwise.***" [Emphasis added].
- Section 6.2 of the Compact provides as follows:
  "The Gaming Operations authorized under this Compact shall be owned solely by the Tribe."
- Section 8.1.2 provides that the Tribe is responsible for "**Ensuring the physical safety of Gaming Operation patrons and employees and any other person while in the Gaming Facility.**" [Emphasis added].

30. Pertinent Definitions from the Tort Ordinance:

- Section 3(A) of the Tort Ordinance defines "Gaming Facility" in the exact same language as in Section 2.8 of the Compact set forth above.
- Section 3(C) of the Tort Ordinance provides as follows:
  "**'Patron' means any person who is a customer or is otherwise lawfully on the premises of the Gaming Facility**." [Emphasis added].
- Section 3(E) provides as follows:
  " 'Tort Claim' means **a claim for injury to the person or property of a patron occurring on the premises of a Gaming Facility based on a claim asserting negligence or an intentional tort.**" [Emphasis added].

31. Defendants erroneously argued that the definition of "Gaming Facility" is strictly limited to buildings where Class III gaming activities occur. This is belied by the plain language of Section 2.8 of the Compact and Section 3(A) of the Tort Ordinance which broadly defines "Gaming Facility" as "***all rooms, buildings,***

***and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation.***" [Emphasis added]. Section 2.9 of the Compact defines "Gaming Operation" as **"*the business enterprise* that offers and operates Class III Gaming Activities *whether exclusively or otherwise.*"**

32. Defendant CABAZON admitted in its Motion to Dismiss that the Tribe is a "business enterprise", the EVTDA, operating a "Gaming Operation", which in addition to offering Class III gambling activities, offers other amenities such as world-class entertainment in the SEC. Thus, the broader definition of Gaming Facility is applicable to Plaintiffs, which definition expands to all "***all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation.***" Plaintiffs were clearly "patrons" as defined by Section 3(C) of the Tort Ordinance in that they were persons who were customers and lawfully on the premises of the Gaming Facility, which includes the restaurant, casino floor, and the SEC, which all serve the activities of the Gaming Operation.

33. Accordingly, pursuant Section 3(E) of the Tort Ordinance, Plaintiffs, as patrons of the Gaming Facility, are entitled to bring claims for injury to their persons, which occurred on the premises of a Gaming Facility based on a claim asserting negligence or an intentional tort.

34. In dismissing the Complaint, the Tribal Court ruled in pertinent part as follows:

> "To the extent that Plaintiff argues that the definition in the Compact (not the Tort Ordinance) of "Gaming Operation" necessarily means that any business conducted by the EVTDA, in any building or location, is covered by the waiver of sovereign immunity found in the Tort Ordinance, that argument is rejected by the Court. In other words, the Court declines

Plaintiff's invitation to define the waiver of sovereign immunity to apply broadly to any activities of the EVTDA and instead the Court looks to whether there is evidence of a nexus between the location where the Plaintiff claims the tort occurred (the SEC), and the Gaming Facility as that phrase is defined in the Tort Ordinance. Plaintiff has not proffered any evidence that a principal purpose of the SEC or the Security Office is to serve the gaming operation. The Court declines to apply the axiomatic approach apparently favored by Plaintiff that any activities of the EVTDA necessarily serve the "gaming operation," as those words were used in the Tort Ordinance.

The Court finds that Plaintiffs are not eligible to proceed under the Tort Ordinance against the Tribe because they were not injured while Patrons of the Gaming Facility. Plaintiff's opposition to this motion is based almost entirely on an argument that the Court construe the phrase "Gaming Operation" as if it is a defined term in the Tort Ordinance. . . . The only defined term in the Tort Ordinance identifying where legitimate claims may arise is "Gaming Facility." The phrase "gaming operation" is not defined nor is it used with capital letters to suggest that the Tort Ordinance uses it as a defined term or term of art. It appears to the Court to be used in its generic everyday meaning suggesting that it is limited to buildings where gambling takes place or occurs, and nothing more." (See, Exhibit "C", page 2, paragraphs 6-7).

## FIRST CLAIM FOR RELIEF

**(For Declaratory Relief – 28 U.S.C. Sections 2201(a) and 2202, *FRCP* 57 – against all Defendants)**

35. Plaintiffs refer to and re-allege each and every allegation contained in paragraphs 1 through 34, inclusive, above, as if set forth herein.

36. Plaintiffs contend that were "Patrons" as defined by Section 3(C) of the Tort Ordinance in that they were persons who were customers and lawfully on the premises of the Gaming Facility, which includes the restaurant, casino floor, and the SEC, which all serve the activities of the Gaming Operation. Accordingly, Plaintiffs are entitled pursue their Tribal Court Complaint pursuant to Defendant CABAZON's Tort Ordinance, and Defendant CABAZON is not entitled to claim sovereign immunity.

37. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties pursuant to the Compact and the Tort Ordinance. Defendants contend that Plaintiffs were not "Patrons" of the "Gaming Facility", and therefore the doctrine of sovereign immunity protects them from liability for the incidents alleged in the Tribal Court Complaint.

38. Plaintiffs request a judicial determination as to their rights and duties under the Compact and the Tort Ordinance.

39. In addition, Plaintiffs request a judicial determination that the Tribal Court erred in dismissing the Tribal Court Complaint based on the findings set forth in its Ruling on the Motion to Dismiss.

40. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain its rights and duties under the Compact and the Tort Ordinance.

41. In addition, a judicial declaration is necessary and appropriate at this time under the circumstances in order for Plaintiffs to determine whether their Tribal Court Complaint may proceed in to trial in the Tribal Court.

42. *Federal Rule of Civil Procedure* 57 provides that the Court may order a speedy hearing on a declaratory judgment action. Accordingly, Plaintiffs hereby respectfully requests a speedy hearing on this Complaint.

WHEREFORE, Plaintiffs respectfully requests that this Court:

1. Declare that Plaintiffs were "Patrons" of Defendant CABAZON's "Gaming Facility" as those terms are defined in the Compact and the Tort Ordinance at the time of the incidents alleged in the Tribal Court Complaint, and therefore are entitled to bring their Tribal Court Complaint against Defendants in the Tribal Court;
2. Declare that Defendants are not entitled to invoke the doctrine of sovereign immunity, because of the limited waiver of the same as required by the Compact and the Tort Ordinance;
3. Declare that the Tribal Court is required to allow Plaintiffs to proceed with their Tribal Court Complaint, and that if the Tribal Court will not exercise jurisdiction over Plaintiff's Tribal Court Complaint, this Court will exercise supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a), and hear the Complaint on the merits; and
4. Grant any further relief to which Plaintiffs may be entitled or which the Court may deem appropriate after a full development of the facts.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to the First Claim for Relief. Pursuant to *Federal Rules of Civil Procedure*, Rules 57, 38 and 39, Plaintiffs are entitled to a jury trial. The nature of an action for declaratory relief is neither legal nor equitable, but *sui generis*. As stated in *Pacific Indemnity Co. v. McDonald*, 107 F.2d 446, 448 (9th Cir. 1939): "… issues of fact are neither legal nor equitable but that their disposition by the court or jury, as the case may be, depends upon the setting in which the issues are framed. If the issues are framed in an action at law the right to a jury trial obtains."

Dated: November 1, 2016

/s/ Martin A. Cervantes
Martin A. Cervantes
Attorney for Plaintiffs MICHAEL FRYDRYCH and SUSAN FRYDRYCH